Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| **EDGARDO LUGO FOURNIER**<br><br>Apelante<br><br><br>v.<br><br><br>**GFR MEDIA, LLC**<br><br>Apelado | KLAN202301063 | **APELACION**<br>Procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil núm.:<br>**SJ2021CV01385**<br><br>Sobre:<br>**DESPIDO INJUSTIFICADO PROCEDIMIENTO SUMARIO** |

Panel integrado por su presidenta la juez Domínguez Irizarry, la juez Grana Martínez y el juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 19 de marzo de 2024.

Comparece la parte apelante, Eduardo Lugo Fournier, mediante el recurso de epígrafe, y nos solicita la revocación de una "*Sentencia*" emitida y notificada por el Tribunal de Primera Instancia, Sala de San Juan, el 17 de noviembre de 2023. Mediante el referido dictamen, el foro primario declaró *Ha Lugar* una solicitud de sentencia sumaria presentada por la parte aquí apelada, GFR Media, LLC, y desestimó una "*Querella*" presentada por la parte apelante.

Por los fundamentos que expondremos a continuación, *se confirma el dictamen apelado.*

**I.**

El 2 de marzo de 2021, Lugo Fournier instó una "*Querella*" en contra de GFR Media al amparo de la Ley de Procedimiento Sumario de Reclamaciones Laborales, 32 LPRA sec. 3118 *et seq.* En la misma, indicó que fue contratado por la referida entidad, en el año 1997,

por tiempo indeterminado. Sin embargo, el 20 de agosto 2020, fue despedido, presuntamente, de manera arbitraria. Para entonces, ocupaba el puesto de *IT Specialist.* Sostuvo que, pese a que GFR Media le manifestó que el despido se debió a una reorganización empresarial, tenía conocimiento de que no se habían despedido a otros empleados que ocupaban el mismo puesto y tenían menos años de antigüedad. A tenor con lo expuesto, afirmó que, dado a que la entidad no respetó el principio de antigüedad dispuesto por la Ley Núm. 80 de 30 de mayo de 1976, 29 LPRA sec. 185a *et seq.*, debía proveerle una compensación. Así, pues, le solicitó al foro primario que condenara a GFR Media a pagarle noventa y dos mil cuatrocientos setenta y ocho dólares con ochenta y cinco centavos ($92,478.85) por concepto de indemnización por despido injustificado, más el pago de honorarios de abogado y las costas.

El 15 de marzo de 2021, la parte apelada presentó su *"Contestación a la Querella".* En el escrito, expuso que el cierre de la economía, causado por la pandemia de COVID-19, le produjo pérdidas de ingresos. Además, explicó que el cambio a trabajo remoto impactó los servicios del departamento de tecnología. En consecuencia, la entidad se vio obligada a llevar a cabo una reorganización, y *eliminar la posición del apelante.* De este modo, planteó que la eliminación de una plaza, como consecuencia de una reorganización, era justa causa para el despido de un empleado conforme a la Ley Núm. 80, *supra.* Al amparo de ello, le solicitó al tribunal de instancia que desestimara la querella presentada.

Tras varias incidencias procesales entre los años 2021 y 2022, el 20 de junio de 2023, GFR Media instó una *"Moción de Sentencia Sumaria".*[1] Mediante la misma, sostuvo que no había disputa en

---

[1] Para sustentar su petitorio sumario, GFR Media incluyó la siguiente documentación: Anejo 1: Deposición de Lugo Fournier, con fecha del 8 de junio de 2022, y su continuación, con fecha del 26 de octubre de 2023; Anejo 2: Declaración Jurada de Néstor Cortés Mojica, quien fungió como *Enterprise Development Senior Manager* en GFR Media, con fecha del 20 de junio de 2023;

cuanto a que GFR Media, a consecuencia del impacto en la economía que ocasionó el COVID-19, tuvo que reorganizar sus operaciones, y, a tenor con ello, eliminó la posición de *IT Specialist* que ocupaba Lugo Fournier, entre otras plazas. Para sustentar su planteamiento, acentuó que, a consecuencia de la referida reorganización, despidió, además del apelante, a José F. Ortiz Mojica, quien era la única otra persona que ocupaba la misma posición, y a David Franquiz, quien los supervisaba a ambos. A su vez, afirmó que dentro de los siguientes seis (6) meses de la cesantía de Lugo Fournier no contrató a nadie que llevara a cabo tareas similares. Incluso, la empresa determinó que los servicios de reparación de los equipos MAC y Apple, los cuales eran exclusivamente brindados por el apelante, en adelante iban a ser prestados por la empresa Modernica, y que, en el futuro, comprarían productos que no fueran de la mencionada marca. Así, pues, GFR Media reiteró que la Ley Núm. 80, *supra*, no prohibía el despido de un empleado a consecuencia de una reorganización, y le solicitó al foro primario que desestimara la presente acción.

En reacción, el 21 de junio de 2023, el representante legal de Lugo Fournier instó una "*Moción para que se Dicte Orden de Solicitud de Prórroga*". En el escrito, alegó que estaba atendiendo un asunto de salud familiar. De este modo, solicitó un término de treinta (30) días para presentar su posición en cuanto al petitorio sumario presentado.

---

Anejo 3: Declaración Jurada de Francisco Brigantty Merced, quien fungió como Director de Finanzas en GFR Media, con fecha del 20 de junio de 2023; Anejo 4: documento intitulado *Unión Status Meeting*, con fecha del 6 de agosto de 2020; Anejo 5: Certificado de Lugo Fournier de Técnico de Computadoras Apple, con fecha del 26 de octubre de 2022, Anejo 6: documento intitulado *Consolidated Financial Statements and Report of Independent Certified Public Accountants,* con fecha del 31 de diciembre de 2019.

El 4 de agosto de 2023, notificada el 7 del mismo mes y año, el foro primario emitió una *"Orden"* en la cual permitió la prórroga solicitada.

Posteriormente, el 21 de agosto de 2023, el abogado del apelante presentó otra solicitud de prórroga. En la misma, expuso que el familiar al cual estaba atendiendo falleció. Así, pues, solicitó veinte (20) días adicionales para presentar la oposición a la solicitud de sentencia sumaria.

Según solicitado, el 22 de agosto de 2023, el tribunal de instancia concedió la prórroga.

El 11 de septiembre de 2023, *por tercera ocasión*, la parte apelante solicitó una prórroga de treinta y cinco (35) días. En el petitorio, alegó que no fue hasta el 6 de septiembre del 2023 que recibió la transcripción de la deposición tomada a la testigo María López Latoni, una presunta representante de GFR Media. Por lo que no había podido revisar la misma y notificarla a la referida testigo, a quien se le había concedido treinta (30) días para examinar la referida transcripción.

En respuesta, el 14 de septiembre de 2023, la parte apelada presentó oposición a la solicitud de prórroga. Destacó que la deposición aludida por la parte apelante se tomó el 11 de octubre de 2022. De modo, que Lugo Fournier había demorado la transcripción de la deposición por once (11) meses. Por otro lado, señaló que, a la fecha, habían transcurrido ochenta y cinco (85) días desde que se presentó la solicitud de sentencia sumaria, por lo que la parte apelante había contado con tiempo suficiente para exponer su posición. Al amparo de lo anterior, arguyó que la prórroga que se le concediera a Lugo Fournier debía ser final y no exceder de diez (10) días.

Según ordenado, el 22 de septiembre de 2023, el apelante replicó a la oposición. Explicó que, aunque la referida deposición fue

tomada hacía once (11) meses, la misma no iba a transcribirse a menos que se utilizara en el juicio o en una solicitud de sentencia sumaria. Así, pues, la transcripción, alegadamente, se comenzó a preparar luego de presentarse el petitorio sumario de la parte apelada. En virtud de ello, le solicitó al foro primario que le concediera los treinta cinco (35) días peticionados. Principalmente, para que se le honraran a la testigo depuesta los treinta (30) días acordados para que revisara la transcripción.

Evaluadas las posturas de las partes, el 13 de octubre de 2023, el tribunal de instancia emitió una *"Orden"* en la que declaró *Ha Lugar* el término solicitado por Lugo Fournier.

Así las cosas, el 18 de octubre de 2023, GFR Media instó *una "Solicitud de Orden"*. En la misma, acentuó que a la fecha habían transcurrido ciento diecinueve (119) días desde que presentó su *"Moción de Sentencia Sumaria"*, y el apelante aún no había presentado su posición. Por otra parte, subrayó que el último término solicitado por Lugo Fournier había transcurrido, de modo que su petitorio sumario debía someterse sin oposición. Expuso que, a tenor con la Regla 6.6 de Procedimiento Civil, 32 LPRA Ap. V, R. 6.6, las prórrogas comenzaban a transcurrir al día siguiente de vencer el plazo cuya prorroga se solicita. Así, pues, explicó que dado a que el término para presentar la oposición a la sentencia sumaria venció el **11 de septiembre de 2023**, el plazo de treinta y cinco (35) días concedido al apelante comenzó a transcurrir el **12 del mismo mes y año**, y venció el **16 de octubre del 2023**. (Énfasis suplido). En virtud de ello, le solicitó al foro primario que diera por sometida su *"Moción de Sentencia Sumaria".[2]*

Examinado lo anterior, el 27 de octubre de 2023, el tribunal de instancia declaró *Ha Lugar* la solicitud de GFR Media.

---

[2] Apéndice del recurso, pág. 71.

Posteriormente, 17 de noviembre de 2023, el referido foro emitió la *"Sentencia"* que nos ocupa. Mediante la misma, determinó que los hechos siguientes no estaban en controversia:

1. El Sr. Lugo comenzó a trabajar para El Día, Inc. en el 1997.

2. El Sr. Lugo trabajó con equipo y sistemas Mac desde sus inicios con El Día, Inc.

3. GFR Media existe desde el 2011 y es la compañía sucesora de El Día, Inc.

4. El 12 de marzo de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-020 por medio de la cual declaró un estado de emergencia ante la pandemia del COVID-19.

5. El 15 de marzo de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-023 mediante la cual estableció un toque de queda y el cierre de todos los comercios en Puerto Rico hasta el 30 de marzo de 2020 con limitadas excepciones.

6. El 30 de marzo de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-029 para, entre otras cosas, extender las disposiciones del toque de queda y de cierre, así como para establecer condiciones adicionales bajo las cuales negocios exentos podrían operar.

7. Durante la vigencia de la Orden Ejecutiva 2020-029, las personas debían permanecer en sus hogares las veinticuatro (24) horas del día, excepto para ir a citas médicas, adquirir alimentos o brindar asistencia a personas de la tercera edad, menores de edad o personas con impedimentos. Asimismo, se extendió el cierre de las actividades comerciales en la isla con ciertas excepciones.

8. El 12 de abril de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-033 para extender las medidas de cierre, de toque de queda y los horarios de operación de ciertos negocios.

9. La Orden Ejecutiva 2020-033 extendió el cierre de las operaciones del gobierno y el toque de queda de veinticuatro (24) horas, excepto que las personas podían salir entre 5:00 a.m. a 9:00 p.m. para acudir a citas médicas, adquirir alimentos, medicinas y otros servicios. El resto de los establecimientos debían permanecer cerrados a no ser que ofrecieran servicios esenciales.

10. El 1 de mayo de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-038. En esta enumeró ciertos sectores que estarían autorizados para retomar sus operaciones el 11 de mayo de 2020. Asimismo, requirió que las personas se

mantuvieran en sus hogares, más permitió: la salida en el horario de 5:00 a.m. a 7:00 p.m. para ir a citas médicas, adquirir comida o medicamentos y recibir o brindar algún servicio exento; y la salida en el horario de 5:00 a.m. a 3:00 p.m. para realizar actividades físicas.

11. El 21 de mayo de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-041 para, entre otras cosas, extender el toque de queda hasta el 15 de junio de 2020 e implantar una reapertura gradual de varios sectores económicos.

12. El 12 de junio de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-044 para, entre otras cosas, permitir la operación de los negocios de venta al detal y los centros comerciales de formato abierto y otros con una ocupación máxima del cincuenta por ciento (50%). Además, mantuvo un toque de queda entre 10:00 p.m. a 5:00 a.m.

13. El 29 de junio de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-048. Esta extendió el toque de queda entre 10:00 p.m. y 5:00 a.m. hasta el 22 de julio de 2020 y permitió el regreso escalonado de algunos empleados públicos.

14. En atención al aumento de los casos de COVID-19 en la isla, el 16 de julio de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-054. Entre otras cosas, esta se emitió para adoptar medidas más restrictivas para controlar la propagación del virus, así como para: extender el toque de queda de 10:00 p.m. a 5:00 a.m. hasta el 31 de julio de 2020; limitar la ocupación máxima de establecimientos a un cincuenta por ciento (50%); y prohibir la operación de establecimientos de bebidas alcohólicas.

15. El 31 de julio de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-060. Esta extendió el toque de queda hasta el 15 de agosto de 2020 e impuso un cierre los domingos que solo permitía la salida de los hogares para citas médicas, emergencias o comprar alimentos. Además, mantuvo cierres comerciales y restricciones de ocupación máxima.

16. El 15 de agosto de 2020, la gobernadora Wanda Vázquez Garced enmendó la Orden Ejecutiva 2020-061 para extender las disposiciones del toque de queda hasta el 21 de agosto de 2020.

17. El 20 de agosto de 2020, la gobernadora Wanda Vázquez Garced emitió la Orden Ejecutiva 2020-062, con vigencia desde el 22 de agosto hasta el 11 de septiembre de 2020. Esta impuso mayores restricciones a los negocios y a la ciudadanía ante el aumento de los casos de COVID-19 en la isla. Entre otras cosas, esta mantuvo el toque de queda y el cierre durante los domingos, así como limitó a veinticinco por ciento (25%) la capacidad máxima en establecimientos.

18. GFR Media tomó medidas de reducción de costos para abril de 2020 que incluyeron: la suspensión de docenas de empleados; moratorias de rentas; negociaciones con contratistas; reducción salarial; y otros recortes en gastos.

19. La suspensión de los empleados de GFR Media que fueron parte de la medida se realizó por un periodo de alrededor de noventa (90) días.

20. La reducción de salarios a los empleados de GFR Media fluctuó entre diez por ciento (10%) y quince por ciento (15%) como consecuencia de la pandemia de COVID-19.

21. GFR Media redujo costos operacionales ante la situación de la pandemia de COVID-19, incluyendo: servicios externos; utilidades; rentas; mercadeo; y salarios y beneficios.

22. GFR Media implantó el trabajo remoto ante las medidas impuestas por la pandemia de COVID-19.

23. Con el trabajo remoto que GFR Media implantó, se redujeron significativamente las tareas de instalaciones de impresoras, configuración de Apple TV e instalación de cableado.

24. El trabajo remoto cambió las necesidades de los servicios en las facilidades de GFR Media.

25. Según lo estimó el Sr. Lugo en su deposición, solo había alrededor de una tercera parte de los empleados físicamente en GFR Media para junio de 2020.

26. La mayor cantidad de empleados que el Sr. Lugo observó en su área de trabajo fue alrededor de treinta y cinco (35) a cuarenta (40).

27. Los cierres totales y el toque de queda que el Gobierno de Puerto Rico impuso como consecuencia de la pandemia de COVID-19, redundaron en la reducción del negocio impreso de periódicos de GFR Media.

28. GFR Media opera en Puerto Rico los siguientes periódicos impresos y digitales: El Nuevo Día y Primera Hora.

29. La venta de la versión impresa del periódico y los anuncios son fuentes importantes y sustanciales de ingresos de GFR Media.

30. La venta de periódicos mediante entregas a domicilio y en cafeterías, restaurantes, colmados y otros puntos de venta forma parte integral de los ingresos de GFR Media.

31. Una vez los establecimientos comerciales dejaron de operar ante el cierre por la pandemia de COVID-19,

estos no tenían un incentivo económico o los medios para publicar anuncios en los periódicos.

32. Entre marzo a julio de 2020, los ingresos de las versiones impresas del periódico tuvieron las siguientes reducciones en comparación con el mismo periodo en 2019: marzo – treinta y ocho por ciento (38%); abril – sesenta y seis por ciento (66%); mayo – sesenta y dos por ciento (62%); junio – cincuenta y seis por ciento (56%); y julio – cincuenta y siete por ciento (57%).

33. Entre abril a julio de 2020, los ingresos de las versiones digitales del periódico tuvieron las siguientes reducciones en comparación con el mismo periodo en 2019: abril – diez por ciento (10%); mayo – dieciséis por ciento (16%); junio – seis por ciento (6%); y julio – seis por ciento (6%).

34. Entre marzo a julio de 2020, los ingresos tuvieron las siguientes reducciones en comparación con el mismo periodo en 2019: marzo – veintiocho por ciento (28%); abril – cincuenta y nueve por ciento (59%); mayo – cincuenta y seis por ciento (56%); junio – cincuenta por ciento (50%); y julio – cincuenta por ciento (50%).

35. Para agosto de 2020, la reducción en ingresos entre el 2019 y 2020 era de un treinta y cinco por ciento (35%) menos de lo obtenido en el año anterior.

36. Conforme al estado financiero auditado de GFR Media para el 2020, la merma en ingresos entre el 2019 y 2020 fue significativa. Los ingresos primordiales se dividen en los siguientes: anuncios generales (*general ads*); clasificados (*classified ads*); ventas en circulación (*circulation*); e insertadores (*inserts*).

37. El ingreso de anuncios generales (*general ads*) para el 2019 fue $35,548,722, mientras que para el 2020 fue de $25,009,223.

38. El ingreso de clasificados (*classified ads*) para el 2019 fue de $7,187,833, mientras que para el 2020 fue de $2,772,794.

39. El ingreso de ventas en circulación (*circulation*) para el 2019 fue de $9,644,755, mientras que para el 2020 fue de $7,230,228.

40. El ingreso de insertadores (*inserts*) para el 2019 fue de $40,056,778, mientras que para el 2020 fue de $33,175,088.

41. Ante el panorama que tenía ante sí, GFR Media despidió en julio de 2020 a empleados que fueron suspendidos temporeramente como parte de las medidas que tomó ante el comienzo de la pandemia de COVID-19.

42. Con miras a enfrentar el impacto de la pandemia de COVID-19, GFR Media evaluó las necesidades en todos

sus departamentos y cómo los servicios se podían ofrecer de una manera adecuada.

43. Para cada área de GFR Media, se consultó con los líderes de los departamentos las necesidades que existían en estos.

44. En cuanto al Departamento de Tecnología, GFR Media determinó eliminar varias plazas y, particularmente, de las que brindaban servicio directo a sus usuarios o empleados.

45. Las medidas relacionadas con la pandemia de COVID-19 (incluso la reducción de la fuerza laboral y la eliminación de plazas) fueron discutidas entre el Departamento de Recursos Humanos, el Departamento de Finanzas, los líderes de los departamentos, así como con el CEO de GFR Media, el señor Juan Mario Álvarez.

46. En la medida en que la restructuración afectaba a empleados unionados, las medidas (incluso lo concerniente a los ingresos) también fueron discutidas con la unión.

47. El Sr. Lugo se desempeñaba para abril de 2020 como *IT Specialist* de GFR Media.

48. Los únicos *IT Specialist* de GFR Media para abril de 2020 eran el señor José F. Ortiz Mojica (en adelante "Sr. Ortiz") y el Sr. Lugo.

49. En la plaza de *IT Specialist*, los deberes o tareas del Sr. Lugo entre abril y agosto de 2020 incluían: brindar apoyo de servicio a los usuarios (empleados) de la empresa; comprar equipos; trabajar con los equipos Mac o Apple; mantener el servidor *File Transfer Protocol*; brindar apoyo al sistema de las transmisiones en vivo; asistir en las instalaciones y configuraciones de los equipos audiovisuales; asistir a los videógrafos con las transmisiones en vivo con las mochilas y antenas de transmisión; reparar *laptops* y configuraciones de *software*; asistir con el *software* de paginación y a los usuarios con los iPhone, iPad y Apple TV; documentar las llamadas en *Manage Engine* (sistema de *tickets* de trabajos); hacer videos de entrenamiento para los usuarios; modificar letreros con reglas de uso del centro de cómputos; y *updates* de computadoras.

50. El deber o la tarea principal del Sr. Lugo era asistir a los usuarios (empleados) de la empresa.

51. El Sr. Lugo contaba con una certificación de técnico en equipo Apple y, para el 2020, era el único en GFR Media que la tenía.

52. Los meses de los cierres llevaron a que GFR Media redujera su fuerza laboral, lo cual ocurrió en julio y agosto de 2020.

53. Mediante la reorganización se eliminaron múltiples plazas, incluso la de *IT Specialist*.

54. El despido del Sr. Lugo ocurrió el 20 de agosto de 2020.

55. Los *IT Specialist* de GFR Media para agosto de 2020 eran el Sr. Lugo y el Sr. Ortiz.

56. El Sr. Ortiz también fue despedido el 20 de agosto de 2020.

57. El Sr. Lugo y el Sr. Ortiz eran supervisados por el señor David Fránquiz (en adelante "Sr. Fránquiz") para agosto de 2020.

58. El Sr. Fránquiz ocupaba la plaza de Gerente de Servicio para agosto de 2020.

59. El Sr. Fránquiz también fue despedido el 20 de agosto de 2020.

60. Al 20 de agosto de 2020, el Sr. Lugo, el Sr. Ortiz y el señor Rafael Algarín (en adelante "Sr. Algarín") tenían plazas diferentes en GFR Media.

61. El Sr. Algarín ocupaba la plaza de *IT Administrator* al 20 de agosto de 2020, mientras que el Sr. Lugo y el Sr. Ortiz ocupaban la de *IT Specialist*.

62. El Sr. Lugo y el Sr. Algarín tenían deberes o tareas distintas al 20 de agosto de 2020.

63. El Sr. Algarín no le dedicaba la mayoría de su tiempo a brindar asistencia a los usuarios o empleados de GFR Media.

64. GFR Media determinó que los servicios de reparación del equipo Mac o Apple fueran prestados por la tienda Modernica, por lo que ya no tendría un técnico de computadoras que se enfocara en ofrecer servicios de Mac o Apple.

65. GFR Media determinó en verano de 2020 que principalmente compraría equipo que no fuera Mac o Apple.

66. GFR Media no contrató a nadie dentro de los siguientes seis (6) meses al despido del Sr. Lugo para ocupar la plaza de *IT Specialist* o llevar a cabo los deberes y tareas que este tenía.[3]

Predicado en lo anterior, el foro primario concluyó que las modificaciones efectuadas por GFR Media en sus operaciones no respondieron a un mero capricho o arbitrariedad, sino a una decisión gerencial válida, para atender el panorama que la compañía

---

[3] Apéndice del recurso, págs. 76-83.

enfrentaba durante la pandemia del COVID-19. Como, por ejemplo, los cambios en las necesidades de sus servicios, la merma de ingresos y necesidad de personal.[4] Así, el Foro Primario declaró *Ha Lugar* la *"Moción de Sentencia Sumaria"* instada la por la parte apelada, y desestimó la *"Querella"* presentada por Lugo Fournier.

Ese mismo día, el 17 de noviembre de 2023, el apelante presentó su oposición a la sentencia sumaria.

Recibido el escrito, el 18 de noviembre de 2023, notificada el 21 del mismo mes y año, el foro primario emitió una *"Orden"* en la que aclaró que la oposición presentada por el apelante *era académica.*[5]

Inconforme, el 27 de noviembre de 2023, Lugo Fournier presentó este recurso, y planteó lo siguiente:

> Erró el Tribunal de Primera Instancia al desestimar la querella al dar por sometida la Moción de Sentencia Sumaria, sin el beneficio de nuestra comparecencia, vilando [*sic*] así nuestro debido proceso de ley.
>
> Erró el Tribunal de Primera Instancia al admitir como evidencia hechos que no tenían ninguna base objetiva.
>
> Erró el Tribunal de Primera Instancia al hacer el análisis de justa causa para el despido.

Entre tanto, ordenamos a la parte apelada a presentar su posición conforme dispone la Regla 22 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XII-B, R. 22. En cumplimiento, el 27 de diciembre de 2023, GFR Media compareció en oposición.

Examinado el expediente, procedemos a resolver.

## II.

### A. Sentencia Sumaria

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Birriel Colón v. Econo y otros,* 2023 TSPR 120, 213 DPR ___ (2023);

---

[4] Íd., págs. 91-92.
[5] Véase, *Sistema Unificado de Manejo de Casos* (SUMAC), entrada núm. 80.

*Serrano Picón v. Multinational Life Ins.*, 2023 TSPR 118, 212 DPR ___ (2023); Oriental *Bank v. Caballero García*, 2023 TSPR 103, 212 DPR ___ (2023); *González Meléndez v. Mun. San Juan et al.*, 2023 TSPR 95, 212 DPR ___ (2023); *Acevedo y otros v. Depto. Hacienda y otros*, 2023 TSPR 80, 212 DPR ___ (2023); *Universal Ins. y otros v. ELA y otros*, 211 DPR 455, 471 (2023); *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *Oriental Bank v. Caballero García,* supra; *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 980. Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra; *Ramos Pérez v. Univisión,* 178 DPR 200, 214 (2010). Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la

cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García,* supra; *Pérez Vargas v. Office Depot*, 203 DPR 687, 698 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra*, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.* Es decir, el hecho de no oponer a un petitorio sumario no implica que este necesariamente proceda, sin embargo, si no se demuestra que existen controversias sustanciales sobre los hechos materiales, nada impide al foro sentenciador de dictar sentencia sumaria. *Ramos Pérez v. Univisión,* supra, pág. 215.

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos

materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra, pág. 44. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil, *supra. Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra*, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole*, 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si bajo ningún supuesto de hechos prevalece la parte promovida. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra, pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Acevedo y otros v. Depto. Hacienda y otros*, supra; *Segarra Rivera v. Int'l. Shipping et al.*, supra. Además, existen casos

que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otros v. ELA y otros,* supra.

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas,* supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.

> *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, "nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria". *González Santiago v. Baxter Healthcare,* 202 DPR 281, 291 (2019). Por ello, nuestra revisión es una *de novo,* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra,* y su jurisprudencia interpretativa. *Íd.* De esta manera, si entendemos que los hechos

materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *Íd.*

## B. Ley Sobre Despidos Injustificados

La Ley Núm. 80, *supra,* forma parte de la colección de legislación protectora del trabajo. Tiene precedentes en la Ley Núm. 48 de 28 de abril de 1930, 31 LPRA sec. 83 nt *et seq.* (derogada), la cual establecía que todo empleado por tiempo indefinido, si era despedido sin justa causa, tenía derecho a una compensación equivalente a la medida o frecuencia en la que recibía la paga por su trabajo, fuera esta semanal o quincenal. Luego, este cuerpo estatutario fue enmendado por la Ley Núm. 50 de 20 de abril de 1949, 29 LPRA 83 nt *et seq.* (derogada). Finalmente, esta última ley fue sustituida por la Ley Núm. 80, *supra*, la cual, a pesar de sus múltiples enmiendas, continúa hoy vigente.

Ley Núm. 80, *supra*, fue aprobada para proveerle protección a los trabajadores, mediante un estatuto reparador que busca remedios más justicieros, y desalentar la incidencia del despido injustificado, arbitrario o caprichoso. *González Santiago v. Baxter Healthcare*, supra, pág. 291; *SLG Zapata–Rivera v. J.F. Montalvo*, 189 DPR 414, 424 (2013). Predicado en ello, el Artículo 1 de la referida ley, establece que un empleado que: (1) esté contratado sin tiempo determinado; (2) reciba una remuneración, y (3) sea despedido de su cargo sin que haya mediado justa causa, tendrá derecho al pago de una indemnización por parte de su patrono, además del sueldo devengado, conocido comúnmente como la mesada. 29 LPRA sec. 185a

Por otra parte, nuestro ordenamiento jurídico ha establecido que un patrono querellado al amparo de la mencionada ley está obligado a establecer, en su alegación responsiva, las circunstancias que justifican el despido. *SLG Torres-Matundan v. Centro Patología*,

193 DPR 920, 932-933 (2015); *Feliciano Martes v. Sheraton,* 182 DPR 368, 385 (2011). Así, pues, la Ley Núm. 80, *supra,* expone un listado, no taxativo, de las razones que constituyen justa causa para el despido. *SLG Torres-Matundan v. Centro Patología,* supra, pág. 930. Sobre este particular, la jurisprudencia ha reconocido que la referida ley no es un código de conducta que establece una lista de faltas definidas o invariables, sino que permite la consideración de las circunstancias, y las normas de los múltiples establecimientos de trabajo. *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 773 (2022); *González Santiago v. Baxter Healthcare of Puerto Rico,* supra, pág. 292; *SLG Torres-Matundan v. Centro Patología,* supra pág. 930; *Srio. del Trabajo v. G.P. Inds., Inc.,* 153 DPR 223, 243 (2001).

Algunas de las instancias que subraya la Ley Núm. 80, *supra,* son atribuibles a la conducta del empleado, mientras que otras están relacionadas a circunstancias que afectan el buen funcionamiento de la empresa. *Segarra Rivera v. Int'l. Shipping et al.,* supra, pág. 983. *SLG Torres-Matundan v. Centro Patología,* supra, pág. 930; *Romero et als. v. Cabrera Roig et als.,* 191 DPR 643, 653 (2014). En lo pertinente al caso de marras, el Artículo 2 de la mencionada ley, dispone que será justa causa para el despido de un empleado lo siguiente:

> […]
>
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento.
>
> […].
>
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
>
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.
>
> 29 LPRA sec. 185b.

De este modo, el legislador reconoció que pueden ocurrir circunstancias de índole económica que sean justa causa para despedir a un empleado, y que liberen a una empresa de la obligación de pagar la correspondiente indemnización. *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 984. Es decir, situaciones que son de tal naturaleza que el despido del obrero resulta inevitable ante las normas usuales y ordinarias que rigen el manejo de los negocios. *SLG Zapata-Rivera v. J.F. Montalvo*, supra, págs. 424-425.

Ahora bien, a pesar de que se permite que una entidad disminuya su plantilla laboral por razón de su situación económica, no toda merma se traducirá en un despido por justa causa. La justa causa, únicamente, aplicará en situaciones en las cuales la disminución económica atente contra la continuidad de la empresa. A tenor con ello, se rechazarán acciones sin fundamentos que no vayan dirigidas a atender el bienestar y la salud física de la empresa. *Íd.*, págs. 426. Es decir, "no se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". *Indulac v. Unión,* 207 DPR 279, 299 (2021); *SLG Torres-Matundan v. Centro Patología,* supra, pág. 931. De otra parte, el patrono deberá presentar evidencia que muestre que verdaderamente hubo una disminución de ganancias. Además, deberá "establecer un nexo causal entre las circunstancias económicas de la empresa y la necesidad del despido". *Segarra Rivera v. Int'l. Shipping et al.*, supra, págs. 985-986.

Finalmente, precisa señalar, que tanto Ley Núm. 80, *supra,* como la jurisprudencia interpretativa han señalado que en este tipo de casos se deberá "retener con preferencia en el empleo al empleado con más antigüedad siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad en el empleo dentro de su clasificación ocupacional que puedan ser desempeñados por

ellos". Art. 3 de la Ley Núm. 80, *supra*, 29 LPRA sec. 185c. Sin embargo, será importante que la retención por antigüedad sea en la misma clasificación y no entre clasificaciones ocupacionales distintas. *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 985. Igualmente, el empleado, de más tiempo, debe contar con las destrezas para realizar las tareas requeridas por el puesto que pasa a ocupar, o que pueda adiestrarse para realizarlas en un tiempo corto, y sin realizarse gastos extremos. *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 428.

**III.**

La parte apelante sostiene que el tribunal de instancia erró en declarar con lugar el petitorio sumario presentado por GFR Media, y en desestimar su *"Querella"*. Luego de examinar este recurso *de novo*, conforme exige la normativa antes expuesta, nos es forzoso concluir que el foro primario no incidió al determinar que *el despido de Lugo Fournier fue por justa causa.*

Ahora bien, antes de comenzar a discutir los planteamientos de Lugo Fournier, puntualizamos que, a pesar de que el apelante incluyó en el apéndice de este recurso su oposición a la solicitud de sentencia sumaria que nos ocupa, no la tomamos en consideración en nuestra apreciación. Es norma firmemente establecida que esta curia está impedida de pasar juicio sobre cuestiones que no fueron planteadas ante el tribunal de instancia. *Díaz Vanga v. CEE II,* 195 DPR 390, 396 (2016)[6]. *Véase,* además, *Trabal Morales v. Ruiz Rodríguez,* 125 DPR 340, 351 (1990). Además, el foro primario fue claro en cuanto a que la *"Moción de Sentencia Sumaria"* se dio por sometida sin oposición, y que la presentación de la misma fue académica, puesto que la misma fue radicada luego de dictada y notificada la sentencia del foro primario.

---

[6] Resolución con voto particular de conformidad emitido por la Jueza Asociada Rodríguez Rodríguez.

Establecido lo anterior, procedemos a resolver las controversias ante nuestra consideración.

En su alegato, Lugo Fournier plantea que el tribunal incidió en resolver la moción de sentencia sumaria sin su comparecencia. *No le asiste razón.* El foro recurrido le otorgó amplia oportunidad al apelante para que presentara su posición. Para ser precisos, *transcurrió un término de más de ciento diecinueve (119) días, durante el cual pudo haber presentado su oposición a la sentencia sumaria.*

Aunque nuestro ordenamiento jurídico favorece la política judicial de que los casos se ventilen en sus méritos, tal principio debe ir en armonía con el propósito de que los pleitos se tramiten de forma justa, rápida y económica. *Mercado Figueroa v. Mun. de San Juan,* 192 DPR 279, 287-288 (2012). Igualmente, debemos acentuar que, en reiteradas ocasiones, nuestro Alto Foro ha manifestado que "una parte no puede adquirir el derecho de que su caso tenga vida eterna en los tribunales manteniendo a la otra parte en un estado de incertidumbre, sin más excusa para su falta de diligencia e interés que una escueta referencia a circunstancias especiales". *Colon Rivera v. Wyeth Pharm.,* 184 DPR 184, 202-203 (2012). *Mun. de Arecibo v. Almac. Yakima,* 154 DPR 217, 221-222 (2001).

Por otra parte, precisa señalar que, conforme esbozamos anteriormente, aquel que incumple con oponerse oportunamente a una solicitud de sentencia sumaria corre el riesgo de que se dicte sentencia sumaria en su contra, si no se muestra que existen controversias esenciales sobre los hechos materiales. Así, ante todo lo expuesto, colegimos que el tribunal de instancia no falló al declarar con lugar la sentencia sumaria presentada por GFR Media sin contar con la posición del apelante.

De otro lado, Luego Fournier afirma que el foro recurrido admitió como evidencia hechos que no tenían base objetiva, e incidió

en concluir que su despido fue por justa causa. *No estamos de acuerdo.*

Según reseñamos, una entidad podrá despedir a un empleado cuando enfrente circunstancias económicas, siempre y cuando evidencie la disminución de ganancias y la necesidad del despido. Igualmente, deberá probar que el despido no fue por mero capricho, y que estuvo relacionado con el buen y normal funcionamiento del establecimiento.

Surge del expediente que GFR Media demostró que a consecuencia de la pandemia del COVID-19, la venta de periódicos y anuncios, la cuál era la fuente de ingresos principal de la entidad, se vio seriamente impactada. Particularmente, porque a consecuencia del cierre de establecimientos comerciales por la pandemia, "estos no tenían un incentivo económico o los medios para publicar anuncios en los periódicos".[7]

Esencialmente, GFR Media expuso, que, entre los meses de marzo a julio de 2020, los ingresos de la versión impresa el periódico sufrieron la diferencia siguiente en comparación con el mismo periodo en el año 2019: "marzo - treinta y ocho por ciento (38%); abril - sesenta y seis por ciento (66%); mayo - sesenta y dos por ciento (62%); junio - cincuenta y seis por ciento (56%); julio - cincuenta y siete por siente (57%)".[8] Por otro lado, entre abril y julio los ingresos de la versión digital del periódico, en comparación con el año 2019, se vieron afectados de la manera siguiente: "abril – diez por ciento (10%); mayo – dieciséis por ciento (16%); junio – seis por ciento (6%); y julio – seis por ciento (6%)".[9] Así, pues, los ingresos de GFR Media se redujeron entre los meses de marzo a julio, en comparación con los del año 2019, según se demuestra a

---

[7] Apéndice del recurso, Declaración Jurada de Francisco Brigantty Merced, pág. 49.
[8] Íd., pág. 50.
[9] Íd.

continuación: "marzo – veintiocho por ciento (28%); abril – cincuenta y nueve por ciento (59%); mayo – cincuenta y seis por ciento (56%); junio – cincuenta por ciento (50%); y julio – cincuenta por ciento (50%)".[10]  De modo que, para agosto de 2020, la diferencia en ingresos, entre el año 2019 y el 2020, era de un treinta y cinco por ciento (35%).[11]

Ante tal panorama, GFR Media tomó la determinación de eliminar varias plazas, particularmente, aquellas que brindaban servicios directos a los usuarios de la empresa, como la de Lugo Fournier, puesto que la mayoría de los empleados de GFR Media habían migrado a trabajar remoto.[12]

Aunque la Ley Núm. 80, *supra,* exige que en los casos de despido por circunstancias económicas se retenga al empleado con más antigüedad, si subsisten puestos vacantes u ocupados por empleados de menos antigüedad en el empleo, dentro de su clasificación ocupacional, esta disposición no aplica en el presente caso. Al respecto, debemos destacar que la única otra persona que desempeñaba las mismas funciones de Lugo Fournier también fue cesanteada. Incluso, la plaza de la persona que los supervisaba a ambos, igualmente, fue eliminada.[13]

En virtud de lo expuesto, justipreciamos que el despido de Lugo Fournier no fue un mero capricho de GFR Media, y se debió a las circunstancias económicas que enfrentó ante la pandemia del COVID-19. Así, pues, coincidimos con el foro recurrido, en cuanto a que la cesantía del apelante estuvo justificada.

---

[10] Íd.

[11] Íd; *Véase*, además, Alegato de la Apelada, documento intitulado *Union Status Meeting*, págs. 78-100.

[12] Apéndice del recurso, Deposición de Lugo Fournier, págs. 33-36.

[13] Apéndice del recurso, Declaración Jurada de Cortes Mojica, págs. 46-47.

**IV.**

Por lo antes expuesto, *se confirma la "Sentencia" apelada.*

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones